elements are most critical to make consistent? Is a focus on comparability of ATC calculation and transparency more important than consistency of ATC calculation?

2. What is a reasonable timeline to achieve the consistency goal?

3. Are there common standards and modeling assumptions that can be developed to calculate TRM and CBM?

4. What are the most critical data to be exchanged among transmission providers to ensure that all are performing ATC calculations most accurately? How should that data be exchanged, what protocols should be used, and what forum should develop the protocols?

5. What is the most important data to make transparent? Regarding the Commission's proposal to require a narrative explanation for changes in monthly or yearly ATC, are there modifications that would achieve the Commission's transparency goals without imposing an undue burden on transmission providers? What ATC information posted in narrative form will be most beneficial?

6. Regarding the proposal to enhance OASIS postings, what are some industry tools/best practices that can be utilized to assist with this effort?

1:45 p.m.–2 p.m.—Break.

2 p.m.–4 p.m.—The Commission's Proposals Regarding Redispatch and Conditional Firm Service.
  • Presentations by Panelists
(* Tentative Panelist):
  Don Furman, PPM Energy, on behalf of American Wind Energy Association (AWEA).
  Patricia Alexander, Consultant/Energy, Dickstein Shapiro LLP, on Behalf of Electric Power Supply Association (EPSA).
  John Lucas, Transmission Services Director, Southern Company Services, Inc.
  Lauren Nichols-Kinas, Bonneville Power Administration (BPA).
  Anthony Taylor, Director of Transmission, Williams Power Company, Inc.
  *Natalie McIntire, Senior Policy Associate, Renewable Northwest Project.
  • Panel discussion topics include related issues raised in the NOPR, as well as the following:

1. Are there improvements to the revised redispatch provision in the pro forma OATT (section 13.5) that are necessary to facilitate redispatch?

2. Would customers be willing to pay for the actual costs of redispatch in addition to the embedded costs of transmission to secure previously unavailable long-term transmission rights? How can the Commission best remove discretion in calculating these costs and create a method for verifying them?

3. What tools are available to allow redispatch to occur using resources other than those owned by the transmission provider?

4. Should curtailments under conditional firm service be specified based on a number of hours per month, when certain transmission constraints or elements bind, when certain load levels are present, or some other factor? How would these different methods be studied and implemented? Which method is preferable from the perspective of the potential conditional firm transmission customers, the network customers and the transmission providers?

5. What curtailment priority should be assigned to conditional firm service? Would this require changes to NERC curtailment protocols? How should changes between firm and non-firm service be handled in real-time systems? Would changes need to be made to e-tags or OASIS?

6. Should conditional firm service be offered indefinitely, or only as a bridge product until transmission upgrades are complete?

[FR Doc. E6–16442 Filed 10–4–06; 8:45 am]
BILLING CODE 6717–01–P

---

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 CFR Part 292

RIN 1076–AE81

Gaming on Trust Lands Acquired After October 17, 1988

AGENCY: Bureau of Indian Affairs, Interior.
ACTION: Notice of proposed rulemaking.

SUMMARY: The Bureau of Indian Affairs proposes to establish procedures that an Indian tribe must follow in seeking to conduct gaming on lands acquired after October 17, 1988. The Indian Gaming Regulatory Act allows Indian tribes to conduct class II and class III gaming activities on land acquired after October 17, 1988, only if the land meets certain exceptions. This proposed rule establishes a process for submitting and considering applications from Indian tribes seeking to conduct class II or class III gaming activities on lands acquired in trust after October 17, 1988.

DATES: Comments must be received on or before December 4, 2006.

ADDRESSES: You may submit comments, identified by the number 1076–AE–81, by any of the following methods:
  • *Federal rulemaking portal: http://www.regulations.gov* Follow the instructions for submitting comments.
  • *Fax:* 202–273–3153.
  • *Mail:* Mr. George Skibine, Director, Office of Indian Gaming Management, Office of the Deputy Assistant Secretary—Policy and Economic Development, 1849 C Street, NW., Mail Stop 3657–MIB, Washington, DC 20240.
  • *Hand delivery:* Office of Indian Gaming Management, Office of the Deputy Assistant Secretary—Policy and Economic Development, 1849 C Street, NW, Room 3657-MIB, Washington, DC, from 9 a.m. to 4 p.m., Monday through Friday.
  Comments on the information collection in this rule are separate from comments on the rule. If you wish to comment on the information collection, you may send a facsimile to (202) 395–6566. You may also e-mail comments to: OIRA_DOCKET@omb.eop.gov.

FOR FURTHER INFORMATION CONTACT: George Skibine, Director, Office of Indian Gaming Management, (202) 219–4066.

SUPPLEMENTARY INFORMATION: The authority to issue this document is vested in the Secretary of the Interior by 5 U.S.C. 301 and 25 U.S.C. 2, 9, and 2710. The Secretary has delegated this authority to the Principal Deputy Assistant Secretary—Indian Affairs by part 209 of the Departmental Manual.

Background

The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2701–2721, was signed into law on October 17, 1988. Section 20 of IGRA, 25 U.S.C. 2719, prohibits gaming on lands that the Secretary of the Interior acquires in trust for an Indian tribe after October 17, 1988, unless the land qualifies under at least one of the exceptions contained in that section. If none of the exceptions in Section 20 applies, Section 20(b)(1)(A) of IGRA provides that gaming can still occur on the lands if:

(1) The Secretary consults with the Indian tribe and appropriate State and local officials, including officials of other nearby tribes;

(2) After consultation, the Secretary determines that a gaming establishment on newly acquired (trust) lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community; and

(3) The Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

EXHIBIT 3

On September 28, 1994, the Bureau of Indian Affairs (BIA) issued to all Regional Directors a Checklist for Gaming Acquisitions and Two-Part Determinations Under Section 20 of the Indian Gaming Regulatory Act. This Checklist was revised and replaced on February 18, 1997. On November 9, 2001, an October 2001 Checklist was issued revising the February 18, 1997 Checklist to include gaming related acquisitions. On March 7, 2005 a new Checklist was issued to all Regional Directors replacing the October 2001 Checklist.

The proposed regulations implement Section 20 of the Indian Gaming Regulatory Act (IGRA) by articulating standards that the Department will follow in interpreting the various exceptions to the gaming prohibition on after-acquired trust lands contained in Section 20 of IGRA. Subpart A of the draft proposed regulations define key terms contained in Section 20 or used in the regulation. Subpart B delineates how the Department will interpret the "settlement of a land claim" exception contained in Section 20(b)(1)(B)(i) of IGRA. This subpart clarifies that, in almost all instances, Congress must enact the settlement into law before the land can qualify under the exception. Subpart B also delineates what criteria must be met for a parcel of land to qualify under the "initial reservation" exception contained in Section 20 (b)(1)(B)(ii) of IGRA. The proposed regulation sets forth that the tribe must have present and historical connections to the land, and that the land must be proclaimed to be a new reservation pursuant to 25 U.S.C. 467 before the land can qualify under this exception. Finally, Subpart B articulates what criteria must be met for a parcel of land to qualify under the "restored land for a restored tribe" exception contained Section 20 (b)(1)(B)(iii) of IGRA. The proposed regulation sets forth the criteria for a tribe to qualify as a "restored tribe" and articulates the requirement for the parcel to qualify as "restored lands." Essentially, the regulation requires the tribe to have modern connections to the land, historical connections to the area where the land is located, and requires a temporal connection between the acquisition of the land and the tribe's restoration. Subpart C sets forth how the Department will evaluate tribal applications for a two-part Secretarial Determination under Section 20(b)(1) of IGRA. Under this exception, gaming can occur on off-reservation trust lands if the Secretary, after consultation with appropriate State and local officials, including officials of nearby tribes, makes a determination that a gaming establishment would be in the best interest of the tribe and its members and would not be detrimental to the surrounding community. The Governor of the State must concur in any Secretarial two-part determination. The proposed regulation sets forth how consultation with local officials and nearby tribes will be conducted and articulates the factors the Department will consider in making the two-part determination. The proposed regulation also gives the State Governor up to one year to concur in a Secretarial two-part determination, with an additional 180 days extension at the request of either the Governor or the applicant tribe.

**Previous Rulemaking Activity**

On September 14, 2000, we published proposed regulations in the **Federal Register** (65 FR 55471) to establish procedures that an Indian tribe must follow in seeking a Secretarial Determination that a gaming establishment would be in the best interest of the Indian tribe and its members and would not be detrimental to the surrounding community. The comment period closed on November 13, 2000. On December 27, 2001 (66 FR 66847), we reopened the comment period to allow consideration of comments received after November 13, 2000, and to allow additional time for comment on the proposed rule. The comment period ended on March 27, 2002. On January 28, 2002 we published a notice in the **Federal Register** (67 FR 3846) to correct the Effective Date section which incorrectly stated that the deadline for receipt of comments was February 25, 2002 and was corrected to read "Comments must be received on or before March 27, 2002." No further action was taken to publish the final rule.

We are publishing a new proposed rule because we have determined that the rule should address not only the exception contained in Section 20(b)(1)(A) of IGRA (Secretarial Determination), but also the other exceptions contained in Section 20, in order to explain to the public how the Department interprets these exceptions.

**Procedural Requirements**

*Regulatory Planning and Review (Executive Order 12866)*

This document has been determined not to be a significant regulatory action and is not subject to review by the Office of Management and Budget (OMB).

(a) This rule will not have an annual economic effect of $100 million or adversely affect an economic sector, productivity, jobs, the environment, or other units of government. The annual number of requests and applications to conduct gaming on trust lands under the exceptions or two-part determination of IGRA have been small. Since IGRA was enacted, approximately two applications per year qualify and have been approved to operate a gaming establishment on trust land under the general exceptions and only three positive two-part determinations have successfully qualified to operate a gaming establishment on trust land under the exception to the gaming prohibition in Section 20 (b)(1)(A) of IGRA.

(b) This rule will not create serious inconsistencies or otherwise interfere with an action taken or planned by another Federal agency. The Department of the Interior (DOI), BIA is the only governmental agency that makes the determination whether to take land into trust for Indian tribes.

(c) This rule will not materially affect entitlements, grants, user fees, loan programs, or the rights and obligations of their recipients. This rule sets out the procedures and criteria for the submission of an application from an Indian tribe seeking to conduct class II or class III gaming activities on land acquired by the Secretary of the Interior under Section 20 of the IGRA.

(d) OMB has determined that this rule will not raise novel legal or policy issues. For this reason, OMB review is not required under Executive Order 12866.

*Regulatory Flexibility Act*

The Department of the Interior certifies that this document will not have a significant economic effect on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Indian tribes are not considered to be small entities for the purposes of this Act.

*Small Business Regulatory Enforcement Fairness Act (SBREFA)*

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule:

(a) Does not have an annual effect on the economy of $100 million or more.

(b) Will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions.

(c) Does not have significant adverse effects on competition, employment,

investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act*

This rule does not impose an unfunded mandate on State, local or tribal governments or the private sector of more than $100 million per year. The rule does not have a significant or unique effect on State, local or tribal government or the private sector. A statement containing the information required by the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*) is not required because only Indian tribes may conduct gaming activities on land acquired after October 17, 1988, only if the land meets the exceptions in Section 20 of IGRA.

*Takings Implication Assessment (Executive Order 12630)*

In accordance with Executive Order 12630, the Department has determined that this rule does not have significant takings implications. The rule does not pertain to the "taking" of private property interests, nor does it impact private property. A takings implication assessment is not required.

*Federalism (Executive Order 13132)*

In accordance with Executive Order 13121, the Department has determined that this rule does not have significant Federalism implications because it does not substantially and directly affect the relationship between the Federal and State governments and does not impose costs on States or localities. A Federalism Assessment is not required.

*Civil Justice Reform (Executive Order 12988)*

This rule complies with the requirements of Executive Order 12988. Specifically, this rule:
(a) Does not unduly burden the judicial system;
(b) Meets the criteria of section 3(a) requiring that all regulations be reviewed to eliminate errors and ambiguity and be written to minimize litigation; and
(c) Meets the criteria of section 3(b)(2) requiring that all regulations be written in clear language and contain clear legal standards. The rule does not preempt any statute.

*National Environmental Policy Act*

The Department has determined that this rule does not constitute a major Federal action significantly affecting the quality of the human environment and that no detailed statement is required under the National Environmental Policy Act of 1969.

*Paperwork Reduction Act*

The information collection has been reviewed and cleared by the Office of Information and Regulatory Affairs, Office of Management and Budget under the Paperwork Reduction Act of 1995, as amended. The collection has been assigned the tracking number of OMB Control Number 1076–0158. The clearance expires November 30, 2006.

The collection of information is unique for each tribe even though each submission addresses the requirements found in § 292.16.

All information is collected in the tribe's application. Respondents submit information in order to obtain a benefit. Each response is estimated to take 1,000 hours to review instructions, search existing data sources, gather and maintain necessary data, and prepare in format for submission. We anticipate that two responses will be submitted annually for an annual burden of 2,000 hours.

Submit comments on the proposed information collection to Attention: Desk Officer for the Department of the Interior, Office of Information and Regulatory Affairs, OMB by facsimile at (202) 395–6566 or by e-mail to OIRA_DOCKET@omb.eop.gov. You should also send comments to the BIA official as found in the **ADDRESSES** section. The BIA solicits comments in order to:
(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the BIA, including whether the information will have practical utility;
(2) Evaluate the BIA's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;
(3) Enhance the quality, utility, and clarity of the information to be collected; and
(4) Minimize the burden of the collection of information on those who are to respond.

OMB is required to make a decision between 30 and 60 days after publication of this document in the **Federal Register**. Therefore, your comment to OMB has the best chance of being considered if OMB receives it within 30 days of publication. This does not affect the deadline for the public to comment to BIA on the proposed rule.

*Consultation With Indian tribes (Executive Order 13175)*

Under the criteria in Executive Order 13175, we have conducted consultation meetings with tribal leaders regarding the proposed regulations in the following locations: Uncasville, Connecticut on March 30, 2006; Albuquerque, New Mexico on April 5, 2006; Sacramento, California on April 18, 2006 and Minneapolis, Minnesota on April 20, 2006. A notice of the consultation meetings was published in the **Federal Register** on April 11, 2006 (71 FR 18350). In addition, a draft regulation was sent to all tribal leaders in the lower 48 states on March 15, 2006, seeking comments on the draft regulation. Numerous comments were received by the Department. The Department revised the draft regulation in response to written comments and oral comments received at the consultation meetings. No action is taken under this rule unless a tribe submits an application to acquire land under Section 20 of IGRA.

*Effects on the Nation's Energy Supply (Executive Order 13211)*

This rule does not have a significant effect on the nation's energy supply, distribution, or use as defined by Executive Order 13211.

*Data Quality Act*

In developing this rule, we did not conduct or use a study, experiment, or survey requiring peer review under the Data Quality Act (Pub. L. 106–554).

*Clarity of This Rule*

We are required by Executive Orders 12866 and 12988 and by the Presidential Memorandum of June 1, 1998, to write all rules in plain language. This means that each rule we publish must:
• Be logically organized;
• Use the active voice to address readers directly;
• Use clear language rather than jargon;
• Be divided into short sections and sentences; and
• Use lists and tables wherever possible.

If you feel that we have not met these requirements, send us comments as instructed in the **ADDRESSES** section. To better help us revise the rule, your comments should be as specific as possible. For example, you should tell us the numbers of the specific sections that are unclearly written, which sections or sentences are too long, the sections where you feel lists or tables would be useful, etc.

*Public Comment Solicitation*

If you wish to comment on the rule, please see the different methods listed in the **ADDRESSES** section; we cannot accept comments via the Internet at this time. Our practice is to make comments,

including names and home addresses of respondents, available for public review during the hours listed in the **ADDRESSES** section. Individual respondents may request that we withhold their home address from the rulemaking record, which we will honor to the extent allowable by law. There may be circumstances in which we would withhold from the rulemaking record a respondent's identity, as allowable by law. If you wish us to withhold your name and/or address, you must state this prominently at the beginning of your comment. However, we will not consider anonymous comments. We will make all submissions from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, available for public inspection in their entirety.

**List of Subjects in 25 CFR Part 290**

Indians—Business and finance, Indians—gaming.

Dated: September 18, 2006.

**Michael D. Olsen,**

*Principal Deputy Assistant Secretary—Indian Affairs.*

For reasons stated in the preamble, the Bureau of Indian Affairs proposes to add Part 292 to Chapter I of Title 25 of the Code of Federal Regulations as follows:

## PART 292—GAMING ON TRUST LANDS ACQUIRED AFTER OCTOBER 17, 1988

**Subpart A—General Provisions**

Sec.
292.1  What is the purpose of this part?
292.2  How are key terms defined in this part?
292.3  When can a tribe conduct gaming activities on trust lands?

**Subpart B—Exceptions to Prohibition on Gaming on After-Acquired Trust Lands**

292.4  What criteria must trust land meet for gaming to be allowed under the exceptions listed in 25 U.S.C. 2719(a) of IGRA?

"Settlement of a Land Claim" Exception

292.5  What must be demonstrated to meet the "settlement of a land claim" exception?

"Initial Reservation" Exception

292.6  What must be demonstrated to meet the "initial reservation" exception?

"Restored Lands" Exception

292.7  What must be demonstrated to meet the "restored lands" exception?
292.8  How does a tribe qualify as having been Federally recognized?
292.9  How does a tribe show that it lost its government-to-government relationship?
292.10  How does a tribe qualify as having been restored to Federal recognition?
292.11  What are "restored lands"?
292.12  How does a tribe establish its connection to the land?

**Subpart C—Secretarial Determination and Governor's Concurrence**

292.13  When can a tribe conduct gaming activities on lands that do not qualify under one of the exceptions?
292.14  Where must a tribe file an application for a Secretarial Determination?
292.15  May a tribe request a Secretarial Determination for lands not yet held in trust?

Application Contents

292.16  What must an application for a Secretarial Determination contain?
292.17  How must an application describe the benefits of a proposed gaming establishment to the tribe and its members?
292.18  What information must an application contain on detrimental impacts to the surrounding community?

Consultation

292.19  How will the Regional Director conduct the consultation process?
292.20  What information must the consultation letter include?

Evaluation and Concurrence

292.21  How will the Secretary evaluate a proposed gaming establishment?
292.22  How does the Secretary request the Governor's concurrence?
292.23  Can the public review the application for a Secretarial Determination?

Information Collection

292.24  Do information collections in this part have Office of Management and Budget approval?

Authority: 5 U.S.C. 301, 25 U.S.C. 2, 9, 2719, 43 U.S.C. 1457.

## Subpart A—General Provisions

### § 292.1 What is the purpose of this part?

This part contains procedures that the Department of the Interior will use to determine whether class II or class III gaming can occur on land acquired in trust for an Indian tribe after October 17, 1988.

### § 292.2 How are key terms defined in this part?

For purposes of this part, all terms have the same meaning as set forth in the definitional section of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. 2703. In addition, the following terms have the meanings given in this section.

*Appropriate State and Local Officials* means the Governor of the State and appropriate officials of units of local government within 25 miles of the site of the proposed gaming establishment.

*BIA* means Bureau of Indian Affairs.

*Contiguous* means two parcels of land having a common boundary. For example, it includes parcels divided by non-navigable waters or a public road or right-of-way.

*Federal recognition or Federally recognized* means the recognition by the Secretary that an Indian tribe has a government-to-government relationship with the United States and is eligible for the special programs and services provided by the United States to Indians because of their status as Indians, and evidenced by inclusion of the tribe on the list of recognized tribes published by the Secretary under 25 U.S.C. 479a–1.

*Former Reservation* means lands that are within the jurisdiction of an Oklahoma Indian tribe and that are within the boundaries of the last reservation for that tribe in Oklahoma established by treaty, Executive Order, or Secretarial Order.

*IGRA* means the Indian Gaming Regulatory Act of 1988, as amended and codified at 25 U.S.C. 2701–2721.

*Land claim* means any claim by an Indian tribe:

(1) Arising from a Federal common law, statutory or treaty-based restraint against alienation of Indian land; and

(2) Made against an individual person or entity (either private, public, or governmental).

*Legislative termination* means Federal legislation that specifically terminates or prohibits the government-to-government relationship with an Indian tribe or that otherwise specifically denies the tribe [and/or its members] access to or eligibility for government services.

*Nearby Indian tribe* means an Indian tribe with tribal Indian lands, as defined in 25 U.S.C. 2703(4) of IGRA, located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe is landless, within a 25-mile radius of its government headquarters.

*Regional Director* means the official in charge of the BIA Regional Office responsible for all BIA activities within the geographical area where the proposed gaming establishment is to be located.

*Reservation* means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in a final treaty, agreement, Executive Order, Federal statute, Secretarial Order or Proclamation, judicial determination,

or court-approved stipulated entry of judgment to which the United States is a party.

*Secretary* means the Secretary of the Interior or an authorized representative.

*Secretarial Determination* means a two-part determination that a gaming establishment on newly acquired lands:

(1) Would be in the best interest of the Indian tribe and its members; and

(2) Would not be detrimental to the surrounding community.

*Surrounding community* means local governments and nearby Indian tribes located within 25 miles of the site of the proposed gaming establishments.

*Tribe* means an Indian tribe.

### § 292.3   When can a tribe conduct gaming activities on trust lands?

This section implements Section 20 of IGRA (25 U.S.C. 2719). A tribe may conduct class II or class III gaming activities on land acquired by the Secretary in trust for the benefit of a tribe after October 17, 1988, only if:

(a) The land meets the criteria or exceptions in Subpart B; or

(b) The Secretary makes a determination under Subpart C of this part and the Governor of the State in which the gaming activity is to be conducted concurs in that determination.

## Subpart B—Exceptions to Prohibition on Gaming on After-Acquired Trust Lands

### § 292.4   What criteria must trust land meet for gaming to be allowed under the exceptions listed in 25 U.S.C. 2719(a) of IGRA?

(a) For class II or class III gaming to be allowed on trust or restricted fee land under section 2719(a)(1) of IGRA, the land must either:

(1) Be located within or contiguous to the boundaries of the reservation of the tribe on October 17, 1988; or

(2) Meet the requirements of paragraph (b) of this section.

(b) For land to be eligible under this paragraph, it must belong to a tribe that had no reservation on October 17, 1988, and must be located:

(1) Within the boundaries of the tribe's former reservation;

(2) Contiguous to other land held in trust or restricted status by the United States for the tribe in Oklahoma; or

(3) In a state other than Oklahoma and within the tribe's last recognized reservation within the State or States within which the tribe is now located.

### "Settlement of a Land Claim" Exception

### § 292.5   What must be demonstrated to meet the "settlement of a land claim" exception?

This section contains criteria for meeting the requirements of IGRA Section 20(b)(1)(B)(i).

(a) Gaming may be conducted on lands covered by this section only when the land has been acquired in trust as part of the settlement of a land claim that either:

(1) Has been filed in Federal court and has not been dismissed on substantive grounds; or

(2) Is included on the Department's list of potential pre-1966 claims published under the Indian Claims Limitation Act of 1982 (Pub. L. 97–394, 28 U.S.C. 2415) and meets the criteria in paragraph (b) of this section.

(b) To be eligible under paragraph (a)(2) of this section, land must be covered by a settlement that either:

(1) States that the tribe is relinquishing its legal claim to some or all of the lands as part of the settlement, results in the alienation or transfer of title to tribal lands within the meaning of 25 U.S.C. 177, and has been enacted into law by the United States Congress; or,

(2) Returns to the tribe lands identical to the lands claimed by the tribe, does not involve an alienation or transfer of title to tribal lands that is prohibited under 25 U.S.C. 177, and is either:

(i) Duly executed by the parties and entered as a final order of a Federal court of competent jurisdiction; or

(ii) Settled by an agreement executed by the State in which the lands claimed by the tribe are located.

### "Initial Reservation" Exception

### § 292.6   What must be demonstrated to meet the "initial reservation" exception?

This section contains criteria for meeting the requirements of IGRA Section 20(b)(1)(B)(ii). Under this section, gaming may be conducted only when all of the following conditions are met:

(a) The tribe has been acknowledged (Federally recognized) through the administrative process under 25 CFR Part 83;

(b) A majority of the tribe's members reside within 50 miles of the location of the land or the tribe's government headquarters are located within 25 miles of the location of the land;

(c) The land is located within an area where the tribe has significant historical and cultural connections;

(d) The land has been proclaimed to be a reservation under 25 U.S.C. 467; and

(e) This reservation is the first proclaimed reservation of the tribe following acknowledgment.

### "Restored Lands" Exception

### § 292.7   What must be demonstrated to meet the "restored lands" exception?

This section contains criteria for meeting the requirements of IGRA Section 20(b)(1)(B)(iii), called the "restored lands" exception. The term "restored lands" is defined in § 292.11. Gaming may only occur under this section when all of the following criteria have been met:

(a) The tribe at one time was Federally recognized, as evidenced by its meeting the criteria in § 292.8;

(b) The tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9; and

(c) At a time after termination, the Tribe was restored to Federal recognition by one of the means specified in § 292.10.

### § 292.8   How does a tribe qualify as having been Federally recognized?

For a tribe to qualify as having been at one time Federally recognized for purposes of § 292.7, at least one of the following must be true:

(a) The United States at one time entered into treaty negotiations with the tribe;

(b) The Department determined that the tribe could organize under the Indian Reorganization Act or the Oklahoma Indian Welfare Act;

(c) Congress enacted legislation specific to, or including, the tribe indicating that a government-to-government relationship existed;

(d) The United States at one time acquired land for the tribe's benefit; or

(e) Some other evidence demonstrates the existence of a government-to-government relationship between the tribe and the Federal Government.

### § 292.9   How does a tribe show that it lost its government-to-government relationship?

For a tribe to qualify for purposes of § 292.7, it must have lost its government-to-government relationship by one of the following means:

(a) Legislative termination; or

(b) Termination demonstrated by historical written documentation from the Departments of the Interior or Justice. The documents must show that the Executive Branch no longer recognized the government-to-government relationship with the tribe or its members.

### § 292.10  How does a tribe qualify as having been restored to Federal recognition?

For a tribe to qualify as having been restored to Federal recognition for purposes of § 292.7, the tribe must show at least one of the following:

(a) Congressional enactment of legislation recognizing, acknowledging, or restoring the government-to-government relationship between the United States and the tribal government (required for tribes terminated by Congressional action);

(b) Recognition through the administrative Federal Acknowledgment Process under 25 CFR 83.8; or

(c) A judicial determination or court-approved stipulated entry of judgment that:

(1) Was entered into by the United States; and

(2) Provides that the tribe's government-to-government relationship with the United States was never legally terminated despite action by the Executive Branch purporting to terminate the relationship with the tribe or its members.

### § 292.11  What are "restored lands?"

For lands to qualify as "restored lands" for purposes of § 292.7, it must be demonstrated that:

(a) The legislation restoring the government-to-government relationship between the United States and the tribe requires or authorizes the Secretary to take land into trust within a specific geographical area and the lands are within the specific geographical area; or

(b) If there is no restoration legislation, or if the restoration legislation does not provide geographic parameters for the restoration of lands, the tribe has a modern connection and a significant historical connection to the land and there is a temporal connection between the date of the acquisition of the land and the date of the Tribe's restoration; and

(c) If the tribe is acknowledged under 25 CFR 83.8, it does not already have an initial reservation proclaimed after October 17, 1988.

### § 292.12  How does a tribe establish its connection to the land?

To establish a connection to the land for purposes of § 292.11, the tribe must meet the criteria in paragraphs (a), (b), and (c) of this section.

(a) A modern connection is established if a majority of the tribe's members reside within 50 miles of the land or if the tribe's government headquarters are located within 25 miles of the land.

(b) A significant historical connection to the land can be established if:

(1) The land is located within the boundaries of the tribe's last reservation reserved to the tribe by a ratified or unratified treaty; or

(2) The land is located in an area to which the tribe has significant documented historical connections, significant weight being given to historical connections documented by official records of the Bureau of Indian Affairs or the Department of the Interior, or by the Indian Claims Commission, other Federal court, or congressional findings.

(c) A reasonable temporal connection between the date of the acquisition of the land and the date of the tribe's restoration is established if:

(1) The land is the first land that the tribe has acquired since the tribe was restored to Federal recognition; or

(2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition.

## Subpart C—Secretarial Determination and Governor's Concurrence

### § 292.13  When can a tribe conduct gaming activities on lands that do not qualify under one of the exceptions?

A tribe can conduct gaming on land covered by this part that does not meet the criteria in Subpart B only after all of the following occur:

(a) The tribe asks the Secretary in writing to make a Secretarial Determination that a gaming establishment on land subject to this part is in the best interest of the tribe and its members and not detrimental to the surrounding community;

(b) The Secretary consults with the tribe and appropriate State and local officials, including officials of other nearby tribes;

(c) The Secretary makes a determination that a gaming establishment on newly acquired lands would be in the best interest of the tribe and its members and would not be detrimental to the surrounding community; and

(d) The Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's Determination (25 U.S.C. 2719(b)(1)(A)).

### § 292.14  Where must a tribe file an application for a Secretarial Determination?

A tribe must file its application for a Secretarial Determination with the Regional Director of the BIA Regional Office having responsibility over the land where the gaming establishment is to be located.

### § 292.15  May a tribe apply for a Secretarial Determination for lands not yet held in trust?

Yes. A tribe can apply for a two-part Secretarial Determination under § 292.13 for land not yet held in trust. The tribe must file its application for a two-part Secretarial Determination at the same time that it applies under 25 CFR Part 151 to have the land taken into trust.

**Application Contents**

### § 292.16  What must an application for a Secretarial Determination contain?

An application requesting a Secretarial Determination under § 292.13 must include the following information:

(a) The full name, address, and telephone number of the tribe submitting the application;

(b) A description of the location of the land, including a legal description supported by a survey or other document;

(c) Proof of identity of present ownership and title status of the land;

(d) Distance of the land from the tribe's reservation or trust lands, if any, and tribal government headquarters;

(e) Information required by § 292.17 to assist the Secretary in determining whether the proposed gaming establishment will be in the best interest of the tribe and its members;

(f) Information required by § 292.18 to assist the Secretary in determining whether the proposed gaming establishment will not be detrimental to the surrounding community;

(g) The authorizing resolution from the tribe submitting the application;

(h) The tribe's gaming ordinance or resolution approved by the National Indian Gaming Commission in accordance with 25 U.S.C. 2710, if any;

(i) The tribe's organic documents, if any;

(j) The tribe's class III gaming compact with the State where the gaming establishment is to be located, if one has been negotiated; and

(k) Any existing or proposed management contract required to be approved by the National Indian Gaming Commission under 25 U.S.C. 2711 and 25 CFR Part 533.

### § 292.17  How must an application describe the benefits of a proposed gaming establishment to the tribe and its members?

To satisfy the requirements of § 292.16(e), an application must contain:

(a) Projections of class II and class III gaming income statements, balance sheets, fixed assets accounting, and cash flow statements for the gaming entity and the tribe;

Federal Register / Vol. 71, No. 193 / Thursday, October 5, 2006 / Proposed Rules    58775

(b) Projected tribal employment, job training, and career development;
(c) Projected benefits to the tribe and its members from tourism;
(d) Projected benefits to the tribe and its members from the proposed uses of the increased tribal income;
(e) Projected benefits to the relationship between the tribe and non-Indian communities;
(f) Possible adverse impacts on the tribe and its members and plans for addressing those impacts;
(g) Distance of the land from the location where the tribe maintains core governmental functions;
(h) Evidence that the tribe owns the land in fee or holds an option to acquire the land at the sole discretion of the tribe, or holds other contractual rights to cause the lands to be transferred directly to the United States;
(i) Evidence of historical connections, if any, to the land; and
(j) Any other information that may provide a basis for a Secretarial Determination that the gaming establishment would be in the best interest of the tribe and its members, including copies of any:
(1) Consulting agreements relating to the proposed gaming establishment;
(2) Financial and loan agreements relating to the proposed gaming establishment; and
(3) Other agreements relative to the purchase, acquisition, construction, or financing of the proposed gaming facility, or the acquisition of the land where the facility will be located.

### § 292.18  What information must an application contain on detrimental impacts to the surrounding community?

To satisfy the requirements of § 292.16(f), an application must contain the following information on detrimental impacts of the proposed gaming establishment:
(a) Information regarding environmental impacts and plans for mitigating adverse impacts, including information that allows the Secretary to comply with the requirements of the National Environmental Policy Act (NEPA); e.g., an Environmental Assessment (EA) or an Environmental Impact Statement (EIS);
(b) Reasonably anticipated impacts on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community;
(c) Impacts on the economic development, income, and employment of the surrounding community;
(d) Costs of impacts to the surrounding community and identification of sources of revenue to mitigate them;
(e) Proposed programs, if any, for compulsive gamblers and the sources of funding; and
(f) Any other information that may provide a basis for a Secretarial Determination that the gaming would not be detrimental to the surrounding community, including memoranda of understanding and inter-governmental agreements with affected local governments.

### Consultation

### § 292.19  How will the Regional Director conduct the consultation process?

(a) The Regional Director will send a letter that meets the requirements in § 292.20 and that solicits comments within a 60-day period to each of the following:
(1) Appropriate State and local officials; and
(2) Officials of nearby tribes.
(b) Upon written request, the Regional Director may extend the 60-day comment period for an additional 30 days.
(c) After the close of the consultation period, the Regional Director must:
(1) Submit a copy of the consultation comments to the applicant tribe;
(2) Allow the tribe to address or resolve any issues raised in the responses to the consultation letters;
(d) The applicant tribe must submit written comments, if any, to the Regional Director within 60 days of receipt of the consultation comments; and
(e) On written request from the applicant tribe, the Regional Director may extend the 60-day comment period in paragraph (d) of this section for an additional 30 days.

### § 292.20  What information must the consultation letter include?

(a) The consultation letter required by § 292.19(a) must:
(1) Describe or show the location of the proposed gaming establishment;
(2) Provide information on the proposed scope of gaming; and
(3) Include other information that may be relevant to a specific proposal, such as the size of the proposed gaming establishment, if known.
(b) The consultation letter must request recipients to submit comments on the following areas within 60 days of receiving the letter:
(1) Information regarding environmental impacts on the surrounding community and plans for mitigating adverse impacts;
(2) Reasonably anticipated impacts on the social structure, infrastructure, services, housing, community character, and land use patterns of the surrounding community;
(3) Impact on the economic development, income, and employment of the surrounding community;
(4) Costs of impacts to the surrounding community and identification of sources of revenue to mitigate them;
(5) Proposed programs, if any, for compulsive gamblers and the sources of funding; and
(6) Any other information that may provide a basis for a Secretarial Determination that the proposed gaming establishment is not detrimental to the surrounding community.

### Evaluation and Concurrence

### § 292.21  How will the Secretary evaluate a proposed gaming establishment?

(a) The Secretary will consider all the information submitted under § 292.17 in evaluating whether the proposed gaming establishment is in the best interest of the tribe and its members.
(b) The Secretary will consider all the information submitted or developed under § 292.18 and all the documentation received under § 292.19 in evaluating whether the proposed gaming establishment would not be detrimental to the surrounding community.
(c) If the Secretary makes an unfavorable Secretarial Determination, the Secretary will inform the tribe that its application has been disapproved, and set forth the reasons for the disapproval.
(d) If the Secretary makes a favorable Secretarial Determination, the Secretary will proceed under § 292.22.

### § 292.22  How does the Secretary request the Governor's concurrence?

(a) If the Secretary makes a favorable Secretarial Determination, the Secretary will send to the Governor of the State:
(1) A written notification of the Secretarial Determination and Findings of Fact supporting the determination;
(2) A copy of the entire application record; and
(3) A request for the Governor's concurrence in the Secretarial Determination.
(b) If the Governor does not affirmatively concur with the Secretarial Determination:
(1) The land may not be used for gaming;
(2) If the land is already held in trust, the applicant tribe may use it for other purposes; and
(3) If the land is proposed for trust status, it may be taken into trust for non-gaming uses after consideration of a revised application.
(c) If the Governor does not respond to the Secretary's request for

concurrence in the Secretarial Determination within one year of the date of the request, the Secretary may, at the request of the applicant tribe or the Governor, grant an extension of up to 180 days.

(d) If no extension is granted or if the Governor does not respond during the extension period, the applicant tribe will be notified in writing that the Secretarial Determination is no longer valid and that its application is no longer under consideration.

### § 292.23 Can the public review the application for a Secretarial Determination?

Subject to restrictions on disclosure required by the Freedom of Information Act (5 U.S.C. 552), the Privacy Act (5 U.S.C. 552a), and the Trade Secrets Act (18 U.S.C. 1905), the tribe's application and all supporting documents will be available for review at the local BIA agency or Regional Office having administrative jurisdiction over the land.

## Information Collection

### § 292.24 Do information collections in this part have Office of Management and Budget approval?

The information collection requirements in §§ 292.16, 292.17, and 292.18 have been approved by the Office of Management and Budget (OMB). The information collection control number is 1076–0158. A Federal agency may not collect or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control.

[FR Doc. E6–16490 Filed 10–4–06; 8:45 am]
BILLING CODE 4310–4N–P

---

## DEPARTMENT OF HOMELAND SECURITY

## Coast Guard

## 33 CFR Part 117

[CGD05–06–089]

RIN 1625–AA09

## Drawbridge Operation Regulations; Lewes and Rehoboth Canal, Mispillion River, DE

**AGENCY:** Coast Guard, DHS.
**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to change the drawbridge operation regulations of three Delaware Department of Transportation (DelDOT) bridges: The Savannah Road/SR 18 Bridge, at mile 1.7, in Lewes, the SR 14A Bridge, at mile 6.7, in Rehoboth, and the S14 Bridge, at mile 11.0, across Mispillion River at Milford, DE. This proposal would allow the bridges to open on signal if 24 hours advance notice is given. This proposal would provide longer advance notification for vessel openings from 2 hours to 24 hours while still providing for the reasonable needs of navigation.

**DATES:** Comments and related material must reach the Coast Guard on or before November 20, 2006.

**ADDRESSES:** You may mail comments and related material to Commander (dpb), Fifth Coast Guard District, Federal Building, 1st Floor, 431 Crawford Street, Portsmouth, VA 23704–5004. The Fifth Coast Guard District maintains the public docket for this rulemaking. Comments and material received from the public, as well as documents indicated in this preamble as being available in the docket, will become part of this docket and will be available for inspection or copying at Commander (dpb), Fifth Coast Guard District between 8 a.m. and 4 p.m., Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Waverly W. Gregory, Jr., Bridge Administrator, Fifth Coast Guard District, at (757) 398–6222.

**SUPPLEMENTARY INFORMATION:**

### Request for Comments

We encourage you to participate in this rulemaking by submitting comments and related material. If you do so, please include your name and address, identify the docket number for this rulemaking CGD05–06–089, indicate the specific section of this document to which each comment applies, and give the reason for each comment. Please submit all comments and related material in an unbound format, no larger than 8½ by 11 inches, suitable for copying. If you would like a return receipt, please enclose a stamped, self-addressed postcard or envelope. We will consider all submittals received during the comment period. We may change this proposed rule in view of them.

### Public Meeting

We do not now plan to hold a public meeting. But you may submit a request for a meeting by writing to Commander (obr), Fifth Coast Guard District at the address under **ADDRESSES** explaining why one would be beneficial. If we determine that one would aid this rulemaking, we will hold one at a time and place announced by a later notice in the **Federal Register**.

### Background and Purpose

Delaware Department of Transportation (DelDOT), who owns and operates the Savannah Road/SR 18 Bridge, at mile 1.7, in Lewes, the SR 14A Bridge, at mile 6.7, in Rehoboth, and the S14 Bridge, at mile 11.0, across Mispillion River at Milford, requested longer advance notification for vessel openings from 2 hours to 24 hours for the following reasons:

*Lewes and Rehoboth Canal*

In the closed-to-navigation position, the Savannah Road/SR 18 Bridge, at mile 1.7, in Lewes and the SR 14A Bridge, at mile 6.7, in Rehoboth, have vertical clearances of 15 feet and 16 feet, above mean high water, respectively. The existing operating regulations for these drawbridges are set out in 33 CFR 117.239, which requires the bridges to open on signal from May 1 through October 31 from 7 a.m. to 8 p.m. and from 8 p.m. to 7 a.m. if at least two hours notice is given. From November 1 through April 30, the draws shall open if at least 24 hours notice given.

DelDOT provided information to the Coast Guard about the conditions and reduced operational capabilities of the draw spans. Due to the infrequency of requests for vessel openings of the drawbridge for the past 10 years, DelDOT requested to change the current operating regulations by requiring the draw spans to open on signal if at least 24 hours notice is given year-round.

*Mispillion River*

The S14 Bridge, at mile 11.0 in at Milford, has a vertical clearance of five feet, above mean high water, in the closed-to-navigation position. The existing regulation is listed at 33 CFR 117.241, which requires the bridge to open on signal if at least two hours notice is given. Due to the infrequency of requests for vessel openings of the drawbridge for the past 10 years, DelDOT requested to change the current operating regulations by requiring the draw spans to open on signal if at least 24 hours notice is given year-round.

### Discussion of Proposed Rule

*Lewes and Rehoboth Canal*

The Coast Guard proposes to revise 33 CFR 117.239, which governs the Delaware highway bridges, at miles 1.7 and 6.7, both at Rehoboth. The bridge names, the statute mile points and the localities in the paragraph would be changed from the "Delaware highway bridges miles 2.0 and 7.0 both at Rehoboth" to the "Savannah Road/SR18 Bridge, at mile 1.7, in Lewes" and the "SR 14A Bridge, at mile 6.7, in